UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VIRGINIA E. MOURNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00772-SEB-DML |
| | ) | |
| TERNES PACKAGING—INDIANA, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the court on Defendant's Motion for Summary Judgment
[Docket No. 70]. On May 5, 2014, Plaintiff Virginia Mourning commenced this action
against Ternes Packaging—Indiana, Inc. ("Ternes"), alleging violations of Title VII of
the Civil Rights Act of 1964 ("Title VII"), 29 U.S.C. § 2000e *et seq.*, the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and the Family and Medical Leave
Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* On September 21, 2015, the parties stipulated to
a joint dismissal with prejudice of Mourning's ADEA and ADA claims. Dkt. 65. On
October 2, 2015, Ternes filed its motion for summary judgment, arguing that it is entitled
to judgment on Mourning's Title VII and FMLA claims. For the reasons detailed herein,
we **GRANT** Defendant's motion.

**Factual Background**

Ternes is an Indiana corporation located in Indianapolis. Ternes is a wholly owned subsidiary of Howard Ternes Packaging Company ("Howard Ternes"), which is headquartered in Livonia, Michigan. Howard Ternes provides "supply chain management solutions" to a variety of customers across several locations. Ternes provides those services to a single customer: Allison Transmission, Inc. ("Allison Transmission").

Ternes has approximately fifty employees and is managed by a General Manager. During all times relevant to this action, Eric Frey served as Ternes's General Manager and reported to Carrie Brown, the Director of Sales for Howard Ternes in Michigan. Michael Dergis and Bonnie Verville served, respectively, as Chief Operating Officer and Vice President of Finance for Howard Ternes in Michigan.

Virginia Mourning began working for Ternes in 1997 as an analyst. In December 1999, she was promoted to Order Administration Manager, a position which she held until her termination in April, 2013. As Order Administration Manager, Mourning reported directly to Eric Frey and her duties included improving customer relations, monitoring customer delivery requirements, resolving internal and external shipping and procedural issues, and supervising ten Order Administrators. Mourning received yearly employee performance evaluations in which her performance was graded on a scale from one to sixty: 1 being considered "Unsatisfactory" and 60 being considered "Clearly Outstanding." See Dkt. 80-6. From September 1999 through May 2012, Mourning received scores of 44, 46, 47, 48, 50, and 51. *Id.*

2

On February 11, 2013, Mourning requested and was granted medical leave under the Family and Medical Leave Act. On March 20, 2013, while Mourning was on leave, eight of the ten Order Administrators whom Mourning supervised filed a complaint with Ternes General Manager Eric Frey. The eight women who filed the complaint alleged that Mourning "use[d] intimidation and contradiction to control" them, was "verbally abusive to her backups," tried to promote gossip amongst them, acted "extremely emotional" in department meetings, "never" followed through on anything, and disclosed confidential disciplinary actions in public meetings. Mourning Dep. Ex. 16; Dergis Aff. Ex. 1; Pierce Aff. Ex. 1; Cook Aff. ¶ 5. The complaining employees claimed that, as a result of Mourning's conduct, they suffered from stress, anxiety, tension, frustration, loss of confidence and self-esteem, lack of desire to report to work, headaches, inability to concentrate, and low morale and productivity. *Id.*

In addition to the eight-person group complaint, one of Mourning's order administrators, Chrissy Cooks, filed two separate specific written complaints in which she claimed that Mourning had engaged in "bullying or humiliating sessions" in front of representatives from Allison Transmission and that during a staff meeting Mourning publicly revealed that she was "writing up" Cooks. Mourning Dep Exs.17, 18; Dergis Aff. Exs. 2, 3. Cooks charged that as a result of Mourning's actions she felt humiliated, embarrassed, and violated. *Id.*

On March 29, 2013, Mourning called Eric Frey to notify him that her physician had cleared her to return to work. Frey informed Mourning that while she was on leave

3

her Order Administrators had filed a complaint against her and that upon her return he needed to speak with her about it.

Sometime between when the complaints were lodged and when Mourning returned from leave, Howard Ternes Director of Sales Carrie Brown made one of her regularly scheduled visits to Ternes in Indianapolis. During her visit, Brown met with Frey, who informed her that Mourning was scheduled to return from leave, but that her department employees had expressed to him that they did not want her to return to her former position.

Brown sought to further investigate these claims by contacting Allison Transmission's Director of Parts Distribution, Ron Sauer, with whom Mourning worked closely. Sauer informed her that Mourning's performance was generally not up to his standards, specifically stating that Mourning was not using available data systems and that she had placed him in multiple compromising positions when he did not have the data he needed to answer his managers' questions. Brown Dep. 115:17–116:14. He further informed Brown that he had previously complained of Mourning's performance to Eric Frey but had not noticed any improvement, and he did not want Mourning to return to his department because things had been running better without her. *Id.* After reviewing the formal complaint filed by the Ternes Order Administrators and speaking with both Frey and Sauer, Brown concluded that Mourning's work performance was "a very big issue." *Id.* at 117:14.

Mourning returned to work on April 1, 2013 and reported directly to Frey's office, where he presented her with complaints and offered her a chance to craft a response. On April 2, 2013, Mourning sent her response to Frey and to Howard Ternes Vice President Bonnie Verville, alleging that the Order Administrators' complaints were "a ruse lead by an individual or individuals to discredit [her] or their own inadequacies as employees" and accused Frey of "buy[ing] in to the above coup." Mourning Dep. Ex. 20. Upon receipt of Mourning's response, Howard Ternes's management launched a two-part investigation. Eric Frey conducted the first part of the investigation by gathering background information to determine the validity of the complaints filed by Mourning's Order Administrators. Howard Ternes's Chief Operating Officer and Vice President of Finance conducted the second half of the investigation by reviewing the complaints, responses, and additional information uncovered by Frey in his investigation as well as considering feedback obtained through Brown's discussion with Allison Transmission management.

During his investigation into the Order Administrator's complaints, Frey obtained emails Mourning had sent to the administrators in which she used callous and unprofessional language as well as disrespectful references to clients. See Dergis Aff. ¶ 9, Ex. 4. Frey also collected a rebuttal from the Order Administrators and the statement of two other Ternes employees who had worked with Mourning who reported some of the same concerns as the Order Administrators had complained of. See Dergis Aff. Exs. 5–7. In reviewing the collected materials, Howard Ternes COO Michael Dergis concluded that

the emails originally proffered in support of the Order Administrators' complaint displayed a lack of judgment, unprofessionalism, and questionable management style by Mourning, but were altogether "pretty weak." *Id.* at ¶ 12; Dkt. 80-5. On the other hand, he believed that the evidence uncovered during Frey's investigation, including the Order Administrators' rebuttal, the statements from former Order Administrators, and the feedback received from Allison Transmission management, effectively substantiated the administrators' complaints. *Id.* at ¶ 12, 13. As a result of the investigation, Howard Ternes's COO Michael Dergis, Vice President of Finance Bonnie Verville, and Director of Sales Carrie Brown all concluded that Ternes could no longer continue Mourning's employment. Dergis Aff. ¶ 14; Brown Aff. ¶ 6.

On April 16, 2013, Dergis, Brown, and Ternes Office Manager Angie Sanders met with Mourning to inform her that, based on their investigation into the Order Administrators' complaint and the feedback they had received from Allison Transmission, her employment with Ternes was terminated for unprofessional conduct toward employees and failure to meet Allison Transmission's performance expectations. Mourning Dep. 161:9–162:14. Ternes General Manager Eric Frey was also terminated for his failure to timely inform Howard Ternes management of the March 20, 2013 complaint against Mourning and for his failure to hold Mourning accountable for her unprofessional conduct and poor performance. Dergis Aff. ¶ 15; Brown Aff. ¶ 5.

On May 5, 2014, Mourning commenced this action against Ternes alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 29 U.S.C. § 2000e *et*

6

*seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Dkt. 1. On December 3, 2014, Mourning amended her complaint to add claims against Allison Transmission for defamation and tortious interference in violation of Indiana law. Dkt. 25. On August 24, 2015, we dismissed the claims against Allison Transmission for lack of subject matter jurisdiction, Dkt. 61, and on September 21, 2014, the parties stipulated to a joint dismissal with prejudice of Mourning's claims under the ADEA and the ADA, Dkt. 65. On October 2, 2015 Ternes filed this Motion for Summary Judgment directed towards Mourning's remaining claims of sex discrimination under Title VII and retaliation under the FMLA. Dkt. 70. Having been fully briefed as of December 14, 2015, Ternes's motion is now ripe for ruling by this court.

## Legal Standard

Summary judgment requires the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a material fact by showing that the evidence cited does not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible

7

evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's asserted fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

On summary judgment, a party must also show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.,* 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller,* 570 F.3d 868, 875 (7th Cir.2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir.2011). The Court need only consider the cited materials, Fed.R.Civ.P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson,* 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan,* 614 F.3d 684, 691 (7th Cir. 2010).

**Discussion**

**I.     Mourning's Title VII Sex Discrimination Claim**

Title VII forbids an employer from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*¸ or national origin." 42 U.S.C. § 2000e2(a)(1). Mourning has claimed the Ternes's termination of her employment was unlawfully motivated by her sex. Under Title VII, she may prove sex discrimination through direct or circumstantial evidence, which may be analyzed under either the direct method or the indirect method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). The direct method allows a plaintiff to prove discrimination by providing "direct evidence" of intentional discrimination, or by compiling a "convincing mosaic of circumstantial evidence" of the same. *See Troupe v. May Dep. Stores Co.,* 20 F.3d 734 (7th Cir. 1994). Given the difficulty of proving an employer's intent "directly," the indirect method offers an alternative. Under the indirect method a plaintiff may create the presumption that her employer's actions were motivated by unlawful discrimination if she can meet the lower threshold of proving a *prima facie* case. *See Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014).

Mourning has put forward no direct evidence of sex discrimination in her case, choosing instead to proceed under the indirect method set forth in *McDonnell Douglas* and its progeny. To establish a *prima facie* case of discrimination under the indirect

method, Mourning must offer evidence that: (1) she is a member of a protected class, (2) she met the employer's legitimate employment expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in her protected class was treated more favorably by her employer. *Coleman*, 667 F.3d at 845; *Langenbach v. Wal-Mart Stores, Inc.,* 672 F.3d 792, 801 (7th Cir. 2014).

Once a *prima facie* case is established, a presumption of discrimination is triggered. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action, "which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993). When the employer succeeds in making such a showing, the burden shifts back to the plaintiff, who must prove by a preponderance of the evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *McDonnell Douglas,* 411 U.S. at 804.

It is undisputed that Mourning has satisfied the first and third prongs under the indirect method of proof: she is a member of a protected class and suffered an adverse employment action. As for the second and fourth prongs, Ternes argues that Mourning lacks sufficient evidence that she was meeting Ternes's legitimate expectations and that a similarly situated employee outside of her class was treated more favorably.

To prove that she was meeting Ternes's legitimate expectations, Mourning points to her "fifteen years of unblemished work history," including her work evaluations from

1999 to May 2012. Her reliance on these evaluations, however, is misplaced. "The question is not whether she *ever* satisfied [Ternes's] expectations, but whether she met [Ternes's] expectations *at the time she was fired.*" *See Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 545–46 (7th Cir. 2002) (emphasis in original). It is well established that "earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Fortier v. Ameritech Mobile Commc'ns,* 161 F.3d 1106, 1113 (7th Cir. 1998); *see Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (holding that plaintiff's prior satisfactory performance evaluations did not establish that she was meeting her employer's legitimate expectations or overcome her more recent disciplinary issues); *see also Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545-46 (7th Cir. 2002) (holding that the fact that plaintiff received a satisfactory performance evaluation at the review immediately preceding his termination did not overcome evidence that he had failed to later meet the employer's expectations).

Here, the complaints prompting the investigation which led to Mourning's eventual termination were filed on March 20, 2013, nine months after her most recent performance evaluation had been conducted in May 2012. There is no evidence that Howard Ternes Management was aware of Mourning's conduct or of her employees' and their sole customer's dissatisfaction with her at any time before they received Mourning's email and launched their investigation in April 2013. To the contrary, it appears that prior to the March 2013 complaints, Ternes General Manager Eric Frey was the only

11

supervisor who was actually on notice of Mourning's allegedly extreme conduct and of Allison Transmission's dissatisfaction with her. With regard to the former, the evidence establishes that Frey met with the Order Administrators on March 1, 2013, during which session the administrators reported, among other things, that Mourning had threatened disciplinary actions against two administrators; had used harshly abusive and unwelcome language with another administrator; had deceitfully taken credit for yet another administrator's work; and had publicly disclosed disciplinary action taken against one of the administrators in order to make an example of her. Dkt. 80-11. With regard to the latter, Ron Sauer reported to Howard Ternes's Director of Sales that he had previously discussed Mourning's performance with Frey, but that he had not seen any improvement. Brown Dep. 116:4–5. The evidence further reveals that the performance evaluations on which Mourning relies were conducted by Frey, who himself had regarded the administrators' complaints as "bullshit," effected no noticeable change in Mourning's performance from the perspective of Ron Sauer, and who was eventually terminated in part because he had failed to hold Mourning accountable for her unprofessional conduct and poor performance. Dergis Aff. ¶ 15; Brown Aff. ¶ 5.  Simply put, evaluations produced more than nine months prior to the filing of formal complaints and the subsequent investigations generated by those complaints—which were conducted by an employee who later lost his job due his own lack of accountability as a manager—do not, by themselves, establish that Mourning was meeting Ternes's legitimate expectations.

Mourning also proffers to the testimony of Sherri Sluss, the manager of another department at Ternes, and Dennis Nicholas, a representative of Allison Transmission, who both testified that they had no problems with Mourning's performance and that they were surprised to hear of her termination. But, as the Seventh Circuit has held, "the general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002); *see also Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance.").

Turning from this discussion of Mourning's proffered evidence of satisfactory job performance to Ternes's proffered evidence that she had in fact failed to meet its legitimate expectations, Mourning attacks the "veracity" and "motivation" of the complaints made against her by her subordinate employees and her customer contact, contending that the emails and conversations uncovered in Ternes's investigation contained an "absence of anything particularly offensive (let alone termination-worthy)." Dkt. 78 at 19.

By attacking the evidence on which Ternes grounds its reasons for her termination, Mourning is in essence claiming that Ternes's proffered reason is pretextual. Normally, we first determine whether a plaintiff has established her *prima facie* before

13

examining whether the employer's reasons for her termination were pretextual. However, our analysis of such issues is not always linear. In some cases the issue of satisfactory performance and the question of pretext overlap. *Adelman–Reyes v. Saint Xavier Univ.,* 500 F.3d 662, 665 (7th Cir. 2007) ("the *prima facie* case and pretext inquiry often overlap; we may skip the analysis of the *prima facie* case and proceed directly to the evaluation of pretext if the defendant offers a non-discriminatory explanation for its employment decision").

To establish pretext, Mourning must demonstrate that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *E.E.O.C. v. Target Corp.,* 460 F.3d 946, 960 (7th Cir. 2006). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.' " *Blise v. Antaramian,* 409 F.3d 861, 867 (7th Cir. 2005) (brackets omitted) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan v. Fleetwood Motor Homes of Indiana, Inc.,* 518 F.3d 486, 492 (7th Cir. 2008); *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir.2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

14

Mourning fails to satisfy her burden with regard to pretext on several grounds. First, the evidence does not support her claim that the administrators' complaints lacked total merit and therefore "Ternes management knew the claims were trumped up pretext." Dkt. 78 at 20. Mourning herself admits to committing several of the actions raised by her employees, including correcting and complaining about the administrators' grammar and spelling in front of customers, publicly disclosing disciplinary actions taken against an administrator, and repeatedly crying during meetings with her supervisor, her subordinates, and her customer. Mourning Dep. 47:22–24, 50:17–23, 52:16–53, 109:24–110:20, 14:1–5. Of course, her opinion that this conduct was not "termination-worthy" is insufficient to establish that Ternes's reliance on it was pretextual. *See Silverman v. Bd. of Educ. of City of Chicago,* 637 F.3d 729, 738 (7th Cir. 2011) (noting that if employee's disagreements with employer's negative assessment of employee's performance "were enough to avoid summary judgment and go to trial on an indirect proof case, summary judgment would become extinct and employer's evaluations would be supplanted by federal juries' evaluations").

However, even if Mourning could establish that her subordinates' complaints were unfounded and her customer's requests were ill-conceived, such would not compel the finding that she was meeting her employer's expectations or that Ternes's reliance those complaints and requests was pretextual. "It is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning

15

that it was a lie." *Ineichen v. Ameritech*, 410 F.3d 956, 960 (7th Cir. 2005).  Moreover, the court's analysis of an employer's legitimate expectations considers more than simply whether a plaintiff's actual job performance was satisfactory; it allows fact-finders to consider factors such as customer satisfaction and workplace camaraderie. *See Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 540 (7th Cir. 2007) (holding that plaintiff's prompt completion of work assignments and lack of prior disciplinary warnings did not overcome evidence that a client had complained of her communication style and that she had sent abrasive emails to her co-workers); *see also Herron v. DaimlerChrysler Corp.,* 388 F.3d 293, 300 (7th Cir. 2004) (holding that plaintiff who performed some aspects of his job well, but had a confrontational and disrespectful attitude, could not show that he was meeting his employer's legitimate expectations). The fact that the majority of Mourning's subordinate employees, along with her primary customer contact, were all complaining of her conduct as well as their interactions with her is clear evidence that Mourning was failing to meet Ternes's legitimate expectations that she conduct herself in a professional manner and foster workplace camaraderie, not to mention customer satisfaction.

Alternatively, Mourning contends that Ternes's multiple versions of its proffered nondiscriminatory reason for her termination show that its actions were dishonest and pretextual. Mourning claims that when she met with Dergis, Brown and Sanders on April 16, 2013, she was told that their investigation "had established she had performance issues, and Allison Transmission did not want her to work there." Dkt. 78 at 24 (citing

Mourning Dep. at 19). Then, when Dergis crafted his interoffice memo, he cited as Ternes's basis for Mourning's termination: (1) the Order Administrators' complaint, and (2) input from Ternes's customer, Allison Transmission, that Mourning was not data-driven, did not embrace change, failed to inform the customer of missed shipments, and that Allison Transmission did not want her to return. *Id.* (citing Dkt. 74-7). Now, in this litigation, Ternes describes its reason for Mourning's termination as "poor performance due to her unprofessional conduct toward direct reports and her failure to satisfy customer expectations." *Id.* (quoting Def.'s Br at 10). According to Mourning, this is an "inconsistent gloss" on Ternes's originally proffered reasons, which proves that Ternes's was actually motivated by animus and/or acted out of discrimination. However, Mourning has not cited a single case, nor are we aware of any, which holds that a defendant's restatement of its proffered nondiscriminatory reasons in order to clarify those reasons without actually revising them establishes pretext.

Lastly, Mourning claims that in 2010 the subordinate employees of another Ternes's Manager, Warren Fish, complained to Eric Frey that Fish was verbally, emotionally, and sexually harassing his employees, and that he conducted himself in an anti-productive and unprofessional manner. Dkt. 78 at 4. Mourning contends that in response to the complaints, Frey offered Fish the option of resigning, being terminated, or taking a demotion, and then, presumably at Fish's request, transferred and demoted him to Ternes's "traffic department" without ever placing anything in Fish's HR folder, allowing Fish to later end his employment with Ternes voluntarily. *Id.* When a plaintiff

claims to have been disciplined more harshly than another similarly situated employee based on a prohibited reason, the plaintiff must demonstrate that the other employee "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Antonetti v. Abbott Labs.,* 563 F.3d 587, 592 (7th Cir. 2009). "Although precise equivalence is not required, a plaintiff still needs to show that a comparator employee was treated more favorably by the same decisionmaker, even though they were both subject to the same standards of conduct and engaged in similar, but not necessarily identical, conduct." *Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014).

Unfortunately, we have insufficient evidence before us on which to compare Fish's conduct and resulting discipline to Mourning's. The only evidence proffered by Mourning in support of her claims regarding Fish is her own deposition testimony and that of Sherri Sluss, each of whom relies almost entirely on conversations she had with other Ternes employees. Both concede that they lack personal knowledge of when Fish left Ternes, whether he resigned or was terminated, and whether his actions (and complaints thereof) were ever reported to Howard Ternes Management in Michigan. Sluss Dep. 37:4–44:14; Mourning Dep. 94:21–96:10. As a result, we lack any evidence establishing who filed the complaints against Fish, how many complaints were filed, or what those complaints alleged. Therefore, we cannot compare them to the complaints filed against Mourning by eight of her subordinate employees and by her primary customer contact. There also is a lack of any evidence establishing that the complaints

18

filed against Fish were relayed to Howard Ternes Management in Michigan, prompting a full investigation, as was the case with Mourning. In fact, we have not been informed of whether Howard Ternes Management was ever made aware of Fish's behavior or was ever involved in his disciplinary process. *See Little v. Ill. Dept. of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004) ("A similarly situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff…[otherwise] [t]he discipline that those employees may, or may not, have received…sheds no light on the decision to discharge [plaintiff].").  Further, we do not know whether, as a result of the employee complaints, Fish was in fact demoted, terminated, or forced to voluntarily resigned; Ternes's contention is unrebutted that Fish was simply moved to the traffic department in order to isolate him during the pending investigation into the complaints filed by his subordinates, and that upon completion of the investigation, he was forced to resign. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) (holding that "the comparatively minimal difference" between forced resignation and termination is insufficient to support an inference of discrimination and survive summary judgment).

"Summary judgment is the 'put up or shut up' moment in a lawsuit," meaning Mourning cannot simply rely on her pleadings or on bare or unfounded testimony to create genuine issues of fact and defeat summary judgment. *Siegel v. Shell Oil Co.,* 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003)).  Because Mourning has failed to present evidence that she was

19

meeting Ternes legitimate expectations, was similarly situated to a more favorably treated employee, or that Ternes's nondiscriminatory reason for her termination was pretextual, Ternes is entitled to summary judgment on her claim of sex discrimination.

## II.      Mourning's Family and Medical Leave Act Retaliation Claim

Mourning also claims that her termination was retaliatory, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Dkt. 1. To establish a *prima facie* case of retaliation in violation of the FMLA, Plaintiff must present evidence that: (1) she was meeting her employer's legitimate expectations, (2) she suffered an adverse employment action, and (3) she was treated less favorably than a similarly situated employee who did not request FMLA leave. *Caskey v. Colgate-Pamlolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008).

As explained above, Mourning has failed to present sufficient evidence to establish that she was meeting Ternes's legitimate expectations at the time of her termination. This alone is entitles Ternes to summary judgment on Mourning's FMLA claim. However, we note additionally with regard to Mourning's FMLA claim that she has failed to name a single Ternes employee with whom she should be compared. Although Mourning identified Warren Fish, "her male counterpart," as a comparator with regard to her Title VII sex discrimination claim, she has neither claimed nor offered any supporting evidence that Mr. Fish did not request or take leave during any point in his tenure at Ternes. Absent direct evidence of retaliation, Mourning must establish these two

prongs of the indirect method under the FMLA. *Caskey*, 535 F.3d at 592. Accordingly,

Ternes is also entitled to summary judgment on Mourning's FMLA claim.

## Conclusion

For the reasons detailed above, we hereby **GRANT** Defendant's Motion for

Summary Judgment [Docket No. 70]. This case is dismissed. Final judgment shall enter

accordingly.


IT IS SO ORDERED.


Date: 2/22/2016      _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Rozlyn M. Fulgoni-Britton
FAEGRE BAKER DANIELS LLP (Indianapolis)
rozlyn.fulgoni-britton@faegrebd.com

Amanda L. Shelby
FAEGRE BAKER DANIELS LLP - Indianapolis
amanda.shelby@faegrebd.com

Edward E. Hollis
FAEGRE BAKER DANIELS LLP - Indianapolis
edward.hollis@faegrebd.com

Steven T. Fulk
FULK & ASSOCIATES
steve.fulk@yahoo.com

Emmanuel V.R. Boulukos
ICE MILLER LLP
emmanuel.boulukos@icemiller.com

Michael L. Tooley
ICE MILLER LLP
Michael.Tooley@icemiller.com